# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| JASON FUNKE,<br><br>                Funke,<br><br>v.<br><br>MARK HATTEN, *et. al*,<br><br>                Defendants. | Case No. 2:19-cv-01335-RFB-EJY<br><br>**<u>ORDER</u>**<br><br>Defendant's Motion for Partial Summary Judgment<br>(ECF No. 21)<br><br>Funke's Cross Motion for Partial Summary Judgment (ECF No. 24) |

## I.    INTRODUCTION

Before the Court are Defendants' Motion for Partial Summary Judgment (ECF No. 21) and Funke's Cross Motion for Partial Summary Judgment (ECF No. 24).

## II.    PROCEDURAL BACKGROUND

On August 2, 2019, Funke filed the operative Complaint. ECF No. 1. On September 27, 2019, Defendants filed a Motion for Partial Summary Judgment. ECF No. 21. Funke responded and Defendant replied. ECF Nos. 23, 25. On October 18, 2019, Funke filed a Cross Motion for Partial Summary Judgment. ECF No. 24. Defendants responded and Funke replied. ECF Nos. 26, 28.

Funke asserts five counts in his case. In Count One, he argues that Officer Hatten's use of deadly force was excessive in violation of the Fourth Amendment. He also alleges in this count that Officer English's use of a police dog was excessive force in violation of the Fourth Amendment. In Count Two, he alleges that Hatten and English violated the Americans with Disabilities Act ("ADA") by failing to accommodate his disability in the course of his detention

and arrest. In Count Three, he alleges a Monell claim against the Las Vegas Metropolitan Police Department ("Metro") for unconstitutional policies or practices related to his encounter with Metro. In Counts Four and Five, he alleges state law claims for negligence, assault and battery.

Defendants' Partial Motion for Summary Judgment seeks summary judgment on Counts One, Two and Three.

Funke's Partial Motion for Summary Judgment seeks summary judgment on Count One.

### III. FACTUAL BACKGROUND

The Court makes the following findings of undisputed and disputed facts.

**A. Undisputed Facts**

The Court finds the following facts to be undisputed based upon the record. The Court notes that the entire incident involving the interaction between Funke and officers was captured on multiple body/air unit cameras. The parties concede that the facts of the incident are not generally disputed.

On August 3, 2017, Funke walked to Life Springs Christian Church and talked to a church leader about some mental health issues, including suicide ideation. The next day, Funke met with church leaders who counselled Funke again. On August 5, 2017, Funke walked back to the church, removed all his clothes, sat in front of the church, and placed money and a handgun on the ground in front of him. Around 11:00 a.m., a church leader called 911 and reported that Funke was "suicidal." He reported that Funke was sitting naked in a meditation pose with a handgun in front of him. He told the dispatcher, "Yeah, this man is suicidal. I talked to him; he's not making sense." The church leader then asked the dispatcher to confirm that the officers would be told that Funke was suicidal. The dispatcher replied, "They already know that he's suicidal." The dispatcher went on to say, "I just told them about the coffee shop yesterday and now he doesn't recognize you. I told them everything you told me." In the communication over the radio to the units heading to the scene, the dispatcher also indicated "no threats made" by the suspect.

Officer Melvyn English, a K9 officer, was the first to arrive on the scene with his dog and set up a position where he could see the area in front of the church. A helicopter air unit ("Air

Unit") from Metro then arrived. Officer Hutcherson was the second officer to arrive on the scene. He entered the church and was told by the Air Unit to stay away from the church entrance. He was also told to keep others away from the church's front doors where Funke sat naked. Funke was sitting naked in a meditational pose in front of the church doors with a black handgun a foot or two in front of him for about ten minutes. Other officers began to arrive on the scene during this time, including Officers Staheli, Kenney, Hunn, Freeman, Sorenson, Quintero and Rowe.

After being seated for about ten minutes, Funke stood up and picked up the gun with his left hand. He walked about 45 feet in front of the church and then switched the gun to his right hand. He walked another 20 feet to the end of the front plaza area of the church and the edge of the parking lot and stopped. He stood with the gun in his right hand in the same place for approximately five minutes. While Funke was standing in this position, Officer Michael Hatten arrived on the scene. He approached English's position from behind English with a rifle. English stood in a position where he could see Funke standing in the plaza. Staheli stood near him. When Funke stood stationary at the edge of the plaza, Hatten took up a shooting position with his rifle on the ground behind a concrete anchor of a light. Funke was within Hatten's sight.

After standing for five minutes, Funke began to walk back very slowly to the front of the church. Hatten then said, "He's starting to move. He starting to move. I'm gonna take a shot." At the time Hatten made this decision, Funke had not been warned by any officer that deadly force was about to be deployed. No officer, trained in crisis or mental intervention or not, had even attempted to contact Funke. After Hatten announced his intention to shoot Funke, Staheli initiated verbal contact with Funke by ordering him to stop walking and drop his gun. Funke immediately dropped his handgun to the ground and put his hands in the air. Funke then started walking up the sidewalk toward Hatten and Staheli's position.

Funke had no other weapons on his body or in his hands. The Air Unit reiterated this over the radio. While Funke was walking toward the officers, Officer English was having some difficulty completely controlling his dog. It barked and pulled at its leash as Funke approached English's position. Officer English then stepped on the sidewalk and started issuing commands. Funke continued walking toward the officers. As Funke approached English, other officers were

3

moving behind Funke to retrieve the dropped handgun.

Funke walked about 75 - 90 feet from the handgun he dropped and then he stopped. He was standing about 20 - 25 feet in front of English. English was directly in front of Funke on the sidewalk with the dog barking and pulling at the leash. Officers then ordered Funke to lay down. Funke hesitated and then started running back down the sidewalk toward the plaza in front of the church. At this point, Officer English released his dog to go after Funke. The dog initially attacked another officer instead. Officer Hatten started chasing Funke and shot Funke in the back. Funke collapsed onto the pavement immobile. Funke was approximately 30 feet away from his dropped gun. The dog then reached Funke and bit into his arm for several seconds which caused a bloody wound.

It is undisputed that Funke had not directly or verbally threatened anyone with the gun, and that he committed no serious crime. He had not raised the weapon towards others or himself. At the time he was shot in the back, he had no weapon. He had not reached down as if he intended to pick up the gun. Officer Hatten did not specifically warn Funke that deadly force was going to be used. Hatten had time to issue such a warning before the deadly force was used and while Funke was running away from officers. No other officer fired a shot.

After Funke was shot in the back and fell to the pavement, the police dog attacked him. The dog bit into and latched onto Funke's left arm. The dog stayed latched onto Funke's arm for about 15 - 20 seconds. The dog's attack and bite caused Funke's right arm to start bleeding. Funke pled profusely and pleaded with officers to remove the dog which was biting into him. Officers had to subsequently apply a tourniquet to Funke's arm to reduce the flow of blood from the dog bite wound.

**B. Disputed Facts**

The parties dispute whether Funke was running to retrieve the gun or simply run away. Other than this, the parties' disputes concern the legal effects and appropriate inferences to draw from the facts.

//

//

## IV. LEGAL STANDARD

### A. Motion for Summary Judgment

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

It is improper for the Court to resolve genuine factual disputes or make credibility determinations at the summary judgment stage. Zetwick v. Cty. of Yolo, 850 F.3d 436, 441 (9th Cir. 2017) (citations omitted).

## V. DISCUSSION

### A. Count 1: Fourth Amendment Excessive Force Claim Against Officers Hatten and English

#### *1. Excessive Force Standard*

Funke and Defendants both seek summary judgment on Count 1 which alleges that Hatten's use of deadly force and Officer English's use of the dog separately constituted excessive force in violation of the Fourth Amendment. Claims of excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 395-97 (1989). Under this standard, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397 (internal quotation marks omitted). In determining

whether a particular use of force was unreasonable and thus in violation of the Fourth Amendment, courts must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the government's countervailing interests. Id.

In evaluating the governmental interest and the reasonableness of the force used, the Court generally considers factors including (a) the severity of the suspect's alleged crime; (b) whether the suspect posed an immediate threat to the officers' safety; and (c) whether the suspect was actively resisting arrest or attempting to escape. Isayeva v. Sacramento Sheriff's Dep't, 872 F.3d 938, 947 (9th Cir. 2017). Other factors relevant to the reasonableness of the force used include "the availability of less intrusive alternatives to the force employed, whether proper warnings were given and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." Id. (citing Glenn v. Washington Cty., 673 F.3d 864, 872 (9th Cir. 2011)). Of all the considerations, the most important is whether the suspect posed an immediate threat to the safety of the officers or others, and when an officer uses deadly force, "this factor becomes a strict requirement." Id. (citing Tennessee v. Garner, 471 U.S. 1 (1985)). The factors are not exclusive, and the Court must consider the totality of the circumstances.

Importantly, the "Supreme Court has crafted a more definitive rule" in "cases involving use of deadly force against a fleeing suspect." Orn v. City of Tacoma, 949 F.3d 1167, 1174 (9th Cir. 2020). Officers may only use deadly force against a fleeing individual if "the officer has *probable cause* to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." Garner, 471 U.S. at 3. (emphasis added). "A suspect may pose a threat of serious physical harm if there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, or if the suspect threatens the officer or others with a weapon capable of inflicting such harm." Villanueva v. California, 986 F.3d 1158, 1169 (9th Cir. 2021). Thus, a police officer may not use deadly force against a fleeing individual unless that individual poses an "*immediate threat*" of serious physical harm. Garner, 471 U.S. at 11 (emphasis added). The Supreme Court further indicated that such an immediate threat generally only arises "if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical

harm." Id. For example, the Ninth Circuit has held that it is not reasonable for police to use deadly force against a fleeing suspect who is actually armed if that suspect does not threaten the officers by pointing the weapon at officers or raising it towards them. Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir. 1991) (noting that it was not reasonable to shoot an armed suspect in the back if he did not raise his gun toward officers).

Defendants argue that Funke was an immediate threat to safety when, without warning, Funke ceased complying with directions and ran back in the direction of his dropped gun. Defendants assert that Funke was actively resisting, and Defendants wanted to avoid crossfire. Defendants say that besides using the police dog, non-lethal alternatives such as using a taser or baton, would not be feasible because Funke was out of range. Funke argues that he was not an immediate threat to safety because he did not directly or verbally threaten anyone with a gun, did not commit any serious crime, and there was no objective indication that he was attempting to retrieve his gun and turn it on police and others. Funke also argues that Defendants failed to warn Funke about deadly force, and that they escalated the situation with yelling, pointed guns, and an uncontrolled dog.

### 2. *Qualified Immunity*

The parties also dispute whether qualified immunity requires dismissal of the excessive force claims against Hatten and English. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Qualified immunity is an immunity from suit rather than a defense to liability, and "ensures that officers are on notice their conduct is unlawful before being subjected to suit." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014). In deciding whether officers are entitled to qualified immunity, courts consider, taking the facts in the light most favorable to the nonmoving party, whether (1) the facts show that the officer's conduct violated a constitutional right, and (2) if so, whether that right was clearly established at the time. Id.

Under the second prong, courts "consider whether a reasonable officer would have had fair

7

notice that the action was unlawful." Id. at 1125 (internal quotation marks omitted). "This requires two separate determinations: (1) whether the law governing the conduct at issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." Green v. City & Cty. of San Francisco, 751 F.3d 1039, 1052 (9th Cir. 2014). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). While a case directly on point is not required for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." Id. at 2083. Further, the right must be defined at "the appropriate level of generality ... [the court] must not allow an overly generalized or excessively specific construction of the right to guide [its] analysis." Cunningham v. Gates, 229 F.3d 1271, 1288 (9th Cir. 2000); see also al–Kidd, 131 S.Ct. at 2084. The plaintiff bears the burden of proving that the right was clearly established. Tarabochia, 766 F.3d at 1125.

In deciding an assertion of qualified immunity where a genuine issue of material fact exists, the court accepts the version asserted by the non-moving party. Ellins v. City of Sierra Madre, 710 F.3d 1049, 1064 (9th Cir. 2013). Summary judgment must be denied where a genuine issue of material fact exists that prevents a finding of qualified immunity. Sandoval v. Las Vegas Metropolitan Police Dept., 756 F.3d 1154, 1160 (9th Cir. 2014).

**A. Officer Hatten's Use of Deadly Force**

The Court first addresses Hatten's use of deadly force. The Court grants summary judgment to Funke as to his excessive force claim against Hatten. The Court finds based upon the undisputed facts that Hatten's use of deadly force was objectively unreasonable as a matter of law. The Court finds that based upon the undisputed facts, Funke did not pose an immediate threat to officers that would justify the use of deadly force. The Court finds that in consideration of the totality of the circumstances, Hatten unlawfully used excessive force against Funke in violation of

the Fourth Amendment.

### i. Funke Had Not Committed A Crime

First, it is undisputed that Funke had not committed any crime at the time deadly force was deployed. He had not threatened anyone before or after officers arrived on the scene. He had been identified as a person having a mental health crisis but who had not threatened anyone. He never raised the gun towards anyone else or himself. As Funke had committed no crime, there can be no argument that the severity of the crime Funke committed supported the use of deadly force.

### ii. Funke Was Not Actively Resisting Arrest but He Was Fleeing Detention

Second, the Court finds that Funke was not actively resisting officers when he was shot, but that he was fleeing detention. He followed officers' commands and walked over 75 feet toward English and Hatten with his hands in the air. As he approached, English stepped out onto the sidewalk with his police dog which was barking and straining at its leash. Funke came within about 15 - 20 feet of the officers and the dog. He stopped for several seconds and then turned and started running away. The officers did not announce to Funke that he would be arrested so he was not in the process of evading arrest when he ran. However, the officers clearly intended to detain Funke and he did not submit to their orders. The Court finds that this factor is not dispositive and does not weigh significantly for either side or in the analysis in this case.

### iii. Officers Knew Funke Was Having A Mental Health Crisis

It is undisputed that officers were informed and could clearly observe that Funke was having a mental health crisis during this encounter. They were informed by the radio operator that Funke was alleged to be suicidal. When officers arrived, Funke was sitting completely naked on the pavement in a seated meditational position in front of the church front doors. He remained in this seated position for at least ten minutes after officers arrived on the scene. He then stood up and walked to the corner of the front of the plaza in front of the church and stood stationary with the handgun in his hand for at least five minutes. He did not speak during this entire time.

It is undisputed that no Metro officer or employee even attempted to contact or speak with Funke for over fifteen minutes despite Funke being clearly in a mental health crisis. No crisis

intervention team members or officers trained in mental health interventions attempted to contact him.

The Air Unit requested a crisis intervention team member be available to speak with Funke, and this request was rejected by officers on the ground as not being feasible. Yet, when Funke was in the plaza, he was clearly within verbal contact range. Indeed, as he walked slowly back toward the church, Staheli verbally contacted Funke from a protected position just before Hatten first said he was going to shoot Funke. Funke immediately responded to Staheli by dropping the handgun and putting his hands in the air. Thus, officers, including Officer Hatten, chose to deploy deadly "force against" an "emotionally disturbed" man despite having the time and the opportunity to engage in some type of mental health intervention. Glenn, 673 F.3d at 872.

### iv. *Funke Was Not Warned Before He Was Shot*

It is also undisputed that Funke was not warned that deadly force would be used if he failed to comply with the officers' commands. Glenn, 673 F.3d at 872. While the officers yelled orders at Funke, no officer told Funke he would be shot if he did not comply. As Funke walked toward officers, he was not warned that if he ran or fled, he would be shot. Hatten had plenty of time to warn Funke of this possibility as Funke walked toward officers with his hands in the air. Hatten chose not to warn him.

As Funke ran away, no officer yelled at him that he would be shot if he continued running. Officer Hatten and other officers had an opportunity before Funke ran and while he was running to warn Funke of the possibility of deadly force. They made no such warning. Indeed, Hatten and other officers had the time and opportunity even before Funke started to walk toward the officers to warn Funke about the use of deadly force. Yet, no officer warned Funke at any point in time about the use of deadly force before it was used.

### v. *Funke Was Not an Immediate Threat to Officers or Others*

In terms of the most pivotal factor in determining whether the use of deadly force was excessive, the Court finds it undisputed that Funke did not pose an immediate threat to officers. There was no probable cause to believe that he posed a significant threat of death or serious physical injury to others when he was shot in the back. There is overwhelming undisputed evidence

to support this finding as a matter of law. He never made any threats to anyone. He never previously raised the gun in a threatening manner toward others or even himself. At the time he was shot, he was not armed. He was at least 30 feet from the handgun on the ground when he was shot. He never bent over to reach down to pick up the gun. He never voiced an intention to retrieve the gun after he had discarded it.

The Court also rejects Defendants' argument that Hatten's subjective belief that Funke was running back to repossess his gun and therefore posed an immediate threat was an objectively reasonable one. While a mistaken belief may be reasonable in some circumstances, "[n]ot all errors in perception or judgment ... are reasonable.... nor does the Constitution forgive every officer's mistake." Torres v. City of Madera, 648 F.3d 1119, 1123–24 (9th Cir. 2011). Where an officer's particular use of force is based on a mistake of act, the Court must ask whether a reasonable officer would have or *should* have accurately perceived that fact." Id.

In this case, the Court first finds that Hatten's subjective belief is not a mistake of fact. It is speculation about a possible future event. Thus, relatedly, and more importantly, this argument misapplies the standard. The inquiry is not whether someone could *potentially* be an "immediate threat" but whether the person is actually an immediate threat at the time the deadly force was used. See Aguirre v. City of W. Covina, 187 F.App'x 755, 757 (9th Cir. 2006)(finding that suspect must be an immediate threat). As the Ninth Circuit explained in Aguirre, "the Supreme Court has said that an officer may use deadly force only when a fleeing suspect poses a threat of serious physical harm, [] not merely when a suspect *potentially* could pose such a threat." Id. (emphasis added). It is irrelevant whether Hatten subjectively believed that Funke was running to eventually retrieve the gun and then threaten someone. Id.; see also George v. Morris, 736 F.3d 829, 838 (9th Cir. 2013) (noting that analysis must be based upon "objective factors" of a threat and not on officers' beliefs). There is no objective evidence that Funke posed an immediate threat at the time he was shot. He was unarmed, naked and running away from officers when he was shot in the back.

Moreover, the Court finds that acceptance of the Defendants' argument would dramatically revise the standard for the use of deadly force. That is because the Defendants' argument as to

Funke being an immediate threat rests upon two speculative assumptions that must both be true to find Funke posed an immediate threat. First, the argument rests on the assumption, without any evidence, that Funke was running *with the intention of retrieving the discarded handgun* rather than simply running away from officers, especially an officer with a barking dog. The objective evidence simply indicates that Funke was running back down the sidewalk toward the plaza where the gun had been discarded. Yet, beside running back in the general direction of the plaza, there is no evidence that Funke had any *intention* of retrieving the gun. Second, the Defendants assume that if Funke retrieved the gun that *he had the intention of threatening officers or others* with the gun. Again, there is no evidence supporting such speculation as to his intentions. In fact, to the contrary, Funke had previously been in possession of the gun in front of the church for over 15 - 20 minutes and he had not threatened anyone, including officers with the gun. Acceptance of this argument would implicitly convert the "immediate threat" requirement under Garner into a "possible threat" factor which could be established by the subjective belief of an officer of another person's intentions notwithstanding contrary objective facts. This is not and never has been the standard for the use of deadly force. Garner, 471 U.S. at 11; see also Aguirre, 187 F.App'x at 757 (accord).

### *vi.* *No Qualified Immunity for Hatten*

Hatten argues that he is entitled to qualified immunity because his actions were reasonable considering the threat posed by Funke because he was a mentally ill individual who ignored orders and attempted to obtain possession of a loaded gun. Hatten argues that there is no Ninth Circuit case clearly establishing that deadly force is unreasonable in such a situation. Funke counters that Hatten's actions constituted a violation of Funke's clearly established Fourth Amendment rights.

The Court finds that Hatten is not entitled to qualified immunity as he violated clearly established law based upon the undisputed facts of this case. First, as the Court has found, Funke did not pose an immediate threat to anyone at the time that he was shot. He was naked, clearly unarmed and running away from officers at the time he was shot in the back by Hatten. He was at least 30 feet away from the discarded gun and making no identifiable movement to pick it up. He was simply running back in the direction he had come and in the direction of the large plaza where

he had dropped the gun. He had made no threats to anyone and did not indicate that he was running to retrieve the gun.

It was clearly established at the time of this incident that police officers could not use deadly force against an individual who did not pose an "immediate threat" to police officers or others. Harris v. Roderick, 126 F.3d 1189, 1204 (9th Cir. 1997)( "[l]aw enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed.")(collecting cases). It was also clearly established that law enforcement may not use deadly force against a fleeing suspect unless they have probable cause to believe that the suspect poses threat of serious physical harm to officers or others. Garner, 471 U.S. at 3, 11; see also Curnow, 952 F.2d at 325. Hatten's actions violated this clearly established law.

### B. Officer English's Use of the Police Dog on Funke

The Court finds that there are genuine issues of disputed fact as to the excessive force claim against Officer English for his use of a police dog on Funke.

The standard with respect to this claim is less rigorous than that applied to the use of deadly force by Hatten. The Court finds based upon the undisputed facts that the use of the dog here constituted serious but moderate force. Brewer v. City of Napa, 210 F.3d 1093, 1098 (9th Cir. 2000) ("[T]he Garner analysis with respect to deadly force generally does not apply to the use of police dogs."); Vera Cruz v. Escondido, 139 F.3d 659, 661 (9th Cir. 1997)(accord). The Court still however considers the relevant factors under Graham, including whether Funke posed "an immediate threat to the safety of the officers or others." Brewer, 210 F.3d at 1098 (quoting Graham, 490 U.S. at 397); see also Miller v. Clark County, 340 F.3d 959, 964 (9th Cir. 2003)(noting that Graham factors applied to use of dog by police).

The Ninth Circuit has explained that it is a violation of the Fourth Amendment for a police officer to sic a dog on an individual who is under control or poses no threat to officers. Mendoza v. Block, 27 F.3d 1357, 1362 (9th Cir. 1994). Officers may sic a dog on a suspect who is believed to be armed and who has been warned that he will be bitten if he does not come out from hiding. Id. 1362-63. However, it is unconstitutional for officers to improperly encourage "continuation of

an attack" by a police dog on a suspect. Watkins v. City of Oakland, 145 F.3d 1087, 1093 (9th Cir. 1998).

The Court finds that there are genuine issues of disputed fact and insufficient facts as to whether English improperly encouraged or directed his dog to attack Funke after Funke had been shot. It is undisputed that Funke was shot and lying immobile when he was attacked by the dog. It is undisputed that Funke was not warned that he could be bitten or attacked by the dog if he did not comply with the officers' orders. It is undisputed that the biting by the dog, which lasted approximately 15 - 20 seconds, created a serious and bloody injury to Funke's arm. It is also undisputed that English was following the dog as it ran after Funke and that English was close enough to it to be giving it orders during its pursuit and ultimate attack on Funke. Funke was shot, bleeding and immobile by the time the dog reached him. It is unclear and disputed when and whether English directed the dog to continue its attack after Funke was shot. As there are genuine issues of disputed fact, the Court denies summary judgment on this claim to both parties.

### *i. Qualified Immunity*

The Court finds that English is not entitled to qualified immunity on this claim as there are genuine issues of disputed fact as to English's actions and directions with his dog. Accepting Funke's asserted version of facts in which English sicced his dog on Funke when he was not a threat to anyone and/or when he was under control would establish a violation of clearly established law. Watkins, 145 F.3d at 1093; Mendoza, 27 F.3d at 1362. As the Court finds that there are genuine issues of disputed fact as to this claim, the Court will deny qualified immunity to English. This claim will proceed to trial.

### B. Count 2: ADA Violation Against LVMPD, Officers Hatten and English

Defendants seek summary judgment on Claim Two against Defendants Metro, Officer Hatten, and Officer English for failure to accommodate under Title II of the ADA. Defendants argue that the claim is time-barred because under the analogous state-law claim, NRS § 651.070, Funke had one year from the date of filing. The relevant incident occurred on August 5, 2017 and the Complaint was not filed until August 2, 2019. Defendants also argue that Funke cannot

maintain those claims against the individual officers. Funke argues that NRS § 651.070 does not apply because Nevada does not provide a counterpart to an ADA Title II arrest claim, and so the appropriate statute of limitations is that for personal injury claims under Nevada law which is two years. Two years is also the statute of limitations for federal § 1983 claims brought in Nevada.

Title II of the ADA, 42 USC § 12132 (emphasis added) states in relevant part:

> Discrimination: "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the **services, programs, or activities of a public entity**, or be subjected to discrimination by any such entity." (emphasis added).

Title II of the ADA does not contain an express statute of limitations. Sharkey v. O'Neal, 778 F.3d 767, 770 (9th Cir. 2015). Instead, courts look to the most appropriate analogous state law claim. Id. The Ninth Circuit explained:

> The ADA is structured as separate titles governing different conduct: Title I covers discrimination in employment; Title II covers discrimination in public services; and Title III covers discrimination in public accommodations and services operated by private entities. It is clear that Congress did not intend every title of the ADA to have the same limitations period. . . . Furthermore, because each title of the ADA encompasses different types of discrimination, as well as different remedies, there is good cause for differing statutes of limitation. Id.

NRS § 651.070 (emphasis added) states:

> Public Accommodations: All persons are entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of **any place of public accommodation**, without discrimination or segregation on the ground of race, color, religion, national origin, disability, sexual orientation, sex, gender identity or expression.

Here, the Court rejects Defendants' arguments that NRS § 651.070 provides the most analogous state law to Funke's ADA Title II claim. The Court finds that NRS § 651.070 does not provide an analogous claim for Funke's allegations in this case. This finding is readily supported by a comparison of the language and object of these two statutes. Title II addresses discrimination in the provision of "services" by "public entities," whereas NRS § 651.070 is directed to discrimination in "public accommodation" including private entities. In the latter regard, this

15

Nevada statute more closely tracks and is analogous to Title III of the ADA which is also directed to discrimination in "public accommodation" by individuals or entities, including private entities. 42 U.S.C. § 12182.

A consideration of the nature of the ADA claim here only underscores why these statutes are not analogous. The nature of Funke's Title II claim is not directed to discrimination in the provision of 'public accommodation' by Metro or any private entity. The claim here is based upon Metro's alleged discrimination in the provision of its services as a public entity. The Court does not find that Nevada provides a direct analogue to Title II of the ADA.

The Court finds that the most analogous statute of limitations for Funke's Title II claim is the two-year statute of limitations for state personal injury and federal § 1983 claims. See generally, Shade v. Las Vegas Metro. Police Dep't, 2017 WL 4390100, at *2 (D. Nev. Sept. 30, 2017). This is consistent with other courts who have applied the statute of limitations period for personal injury claims when there is no direct analogue to an ADA Title II claim in state law. See. e.g., McCormkick v. Miami Univ., 693 F.3d 654, 664 (6th Cir. 2012)(finding the statute of limitations period for a Title II claim in Ohio to be that for personal injury claims because Ohio has no analogue to Title II).

Funke also pursues his Title II claim against Hatten and English in their official capacities. He does not dispute that he cannot recover monetary damages from them in their individual capacities. Individuals are not held liable under the ADA. 42 USC § 12131. The Court finds, however, that Metro may be held vicariously liable for the official actions of its officers in this case. Sheehan v. City and Cty. Of San Francisco, 743 F.3d 1211, 1231 (9th Cir. 2014) (*reversed, in part, on other grounds*, Sheehan, 135 S. Ct. 1765 (2015)). Accordingly, the ADA claim against Hatten and English shall proceed and be construed as a single Title II claim against Metro based upon the official actions of Hatten and English.

### C. Count 3: Monell claim against LVMPD

Defendants seek summary judgment on Funke's Monell claim in Count 3.

Under Monell, a government entity may be liable for deprivation of rights caused by its

own official policies, customs, or practices. Monell v. Dept. of Social Servs, 436 U.S. 658, 690–92 (1978). Defendants argue that Funke has not met the basic pleading standard because he has not identified any Metro policy, custom, or practice that when enforced, caused the alleged constitutional violations. Funke argues that his Monell claim is adequately pled and that he asserted sufficient facts for this claim to proceed to trial.

The Court finds that Funke met his burden of pleading and alleging sufficient disputed facts for the Monell claim to proceed. Funke specifically alleges a practice of "failing to supervise and train officers in association with the use of force against persons with mental health disabilities." The record provides sufficient evidence of such a practice for this claim to proceed. For example, the record demonstrates that the officers on the scene did not meaningfully engage Funke in the midst of his mental health crisis or engage in identifiable de-escalation or other related tactics. The other officers appeared not to have a plan or strategy that reflected training in dealing with an individual suffering a mental health crisis. Officers on the scene actually rejected a request from the Air Unit to have an officer engage Funke to address his mental health issues. Moreover, this situation involved a mental health crisis identified to officers and Metro prior to officers arriving on the scene. However, the officers' approach arguably did not reflect intervention techniques based upon this known aspect to the situation. There are sufficient disputed facts to support this claim.

Accordingly, the Monell claim shall proceed.

## VI. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for Partial Summary Judgment (ECF No. 21) is DENIED.

**IT IS FURTHER ORDERED** that Funke's Cross Motion for Partial Summary Judgment (ECF No. 24) is GRANTED in part and DENIED in part. The Court grants summary judgment on Funke's excessive force claim against Defendant Hatten. This claim shall proceed to trial for the determination of damages. Funke's remaining claims will proceed to trial for determination of both liability and damages if they apply.

**IT IS FURTHER ORDERED** that the parties shall submit a Joint Pretrial Order by August 2, 2021.

DATED: June 8, 2021

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**